IN the INTEREST OF J.K.V., a Child

No. 06–15–00063–CV

Court of Appeals of Texas, Texarkana.

Submitted: December 29, 2015

Decided: January 22, 2016

Alex Tyra, Law Office of Alex Tyra, PC, Longview, TX, for appellant

Rebecca L. Safavi, Office of General Counsel, Austin, TX, for appellee

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

In a suit brought by the Department of Family and Protective Services (the Department), Emma's parental rights to three-year-old J.K.V.[1] were terminated after a bench trial. On appeal, Emma complains that the evidence was factually insufficient to support the trial court's finding that termination was in J.K.V.'s best interest. Because the evidence is factually sufficient to support the trial court's best-interest finding, we affirm the trial court's judgment.

## I. Background

Emma checked into the Women's Center of East Texas (the Center) in November 2013 after her roommate, whom she described as a "drug addict," struck eighteen-month-old J.K.V.[2] Shortly after she entered the Center, Emma lost her job. Not long after that, and while she remained a shelter resident, Emma gave birth to a second child, K.V.,[3] in February 2014.

Emma experienced difficulties during the time she lived at the Center with her two children. She engaged in two verbal altercations with residents of the Center,

she refused to sign the Center's cooperative living agreement, and she became very angry when an employee of the Center tried to speak with her, a second time, about cooperation. On witnessing his mother's anger, J.K.V. became very distressed and threw himself down on the floor.

In April 2014, the Department was called to the Center and ultimately removed J.K.V. and K.V. from Emma's care. On April 29, the Center contacted the Department with a report that J.K.V. had fallen and bruised his face and cut his head. Although the Good Shepherd Healthy Hotline advised the Center that Emma should take J.K.V. to the hospital, Emma refused to do so. Department investigator Jessica Galindo visited the Center that evening and, on learning that Emma had gone to bed, advised the Center to ask Emma to take J.K.V. to the hospital the following morning. Galindo returned to the Center the following day, only to learn that Emma had not taken J.K.V. to the hospital. Instead, Emma had taken the children with her to a beauty salon appointment which she had.

In speaking with Galindo, Emma denied ever having been told to take J.K.V. to the hospital. Galindo observed a laceration or "deep cut" on J.K.V.'s forehead and an abrasion on his cheekbone. Galindo stated that J.K.V.'s injuries were not consistent with the description Emma provided—that J.K.V. fell on concrete while Emma was looking at apartments. Emma refused the Department's request that she take J.K.V.

---

1. In this opinion, we refer to the appellant as Emma and to the child by his initials in order to protect the identity of the child. *See* Tex.R. App. P. 9.8.

2. At the time of the termination hearing, J.K.V.'s father was residing in Mexico. When the Department made contact with him, Fa-

ther stated that he left Emma because she was using drugs and was "seriously crazy."

3. Emma's parental rights to K.V. were likewise terminated. We address Emma's appeal of the termination order pertaining to K.V. in an opinion issued of even date herewith in our cause number 06–15–00067–CV.

to the hospital to be evaluated. During the time Galindo was speaking with Emma, J.K.V. was removing pill bottles from Emma's bag and was placing the bottles in his mouth. He also put an open bottle of baby powder in his mouth. Emma did not respond to these activities. Galindo also observed J.K.V. crying and seeking attention.

Also during this interview, Emma received an instant-read drug test, which indicated that she had ingested methamphetamine. Emma agreed to submit to a urine drug screen at that time, but thereafter quickly became upset and irate and insisted that she and the children would leave the Center immediately. J.K.V. became distraught and clung to Emma, while Emma was screaming and crying uncontrollably. Finally, Emma threw herself into a chair, screamed that she could no longer feel her arms and legs, and fell to the floor in a fetal position.

Eventually, Emma and J.K.V. were transported by ambulance to the emergency room at Good Shepherd Medical Center. Emma was again screaming and "out of control." She was cursing and refusing to speak English. At that point, Galindo made the decision to remove the children from Emma, who had no home for the children, no reliable transportation, and no dependable economic resources. She was unable to provide food, clothing, or medical care for the children. In the meantime, J.K.V. was tended by nurses,[4] who were feeding him snacks. Emma had stated earlier that even though J.K.V. was eighteen-months old, she only fed him formula due to her fear that the Center's staff was poisoning the food.

Although she was advised of the time and place of the scheduled fourteen-day hearing, Emma did not appear at the hearing. She did, however, visit with Galindo in her office when Galindo returned from the hearing, stating that she wanted to see her children. When Emma learned that the hearing had already occurred, she became irate and called the police, stating that Galindo should be arrested for kidnapping.

Dionne Jorden, a caseworker with the Department, testified that Emma became confrontational in a discussion about working services, refused to discuss her service plan, and refused to work services. Emma refused to accept a copy of the service plan and refused to sign the plan. Emma did submit to a psychological evaluation, but did not go to counseling.

Jorden observed that the children were not bonded to Emma during the five occasions Emma visited with them subsequent to their removal. When Emma visited the children, she hugged J.K.V., but he would not attempt to return the hug, and it looked as if hugging by her was foreign to him. According to Jorden, J.K.V. did not display any affection toward Emma, and there was no display of separation anxiety by J.K.V. when Emma's visits concluded. He sometimes ran out of the room when the visit was concluded. In October 2014, Emma stopped showing up for her visitation, and the Department was unable to contact her. In November 2014, the Department was advised by Emma's brother-in-law that Emma had gone to Mexico. Emma explained that she did not tell the Department she was going to Mexico because she did not know what she was doing. In August 2014, Emma became very depressed and attempted suicide. She was then admitted "into a behavioral hospital in Tyler," but on her release, she again attempted suicide. After her second failed suicide attempt, Emma fled to Mexi-

4. J.K.V. was diagnosed with a mild concussion and a sinus infection.

co, where she was admitted to a drug rehabilitation center for thirty days.

In December 2014, Emma called the Department to let them know that she was in Mexico. Emma made no further contact with the Department from January through July 2015. Then, on August 10, Emma called the Department to advise that she had returned to Longview. She stated that she was aware of the termination hearing scheduled for August 18. Emma testified that she had conquered her drug habit, that she wanted to raise her children, and that she would do anything for them.[5] At the time of the hearing, Emma was employed at a restaurant and was renting a house in Longview.

Emma has presented no plan to provide for her children and has taken no action under the service plan to demonstrate her ability to change the risky behavior that led to the Department's involvement. There is no evidence that Emma ever sought medical treatment for her children or that she was able to perceive the children's medical, emotional, and physical needs. Likewise, there is no evidence that Emma was ever able to provide a safe and stable home for her children.

At the time of the termination hearing, J.K.V. was living in a foster home, where he had been living since April 30, 2014. The foster mother was advised by a pediatrician that J.K.V. was not having his needs met before he was separated from Emma, as he had blossomed and grown "quite a bit" since joining his foster family. At the time of trial, J.K.V. was very comfortable and had bonded with his foster parents, who had shown him a great deal of affection. J.K.V.'s emotional stability has increased since he has been in foster care. When he initially came into the

home, he experienced nightmares and was prone to temper tantrums. He has continued to become more and more consistent in good behavior. The foster parents have met J.K.V.'s physical and emotional needs, and wish to adopt him.

## II. Standard of Review

The standard of review in parental-rights termination proceedings is clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (West Supp.2015); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex.2002). The evidence is clear and convincing when the proof is such that it produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established by the State. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex.2009).

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 27 (Tex.2002). We consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.C.F.*, 96 S.W.3d at 266. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19. In applying this standard in light of the "clear and convincing" language required by Section 161.001 of the Texas Family Code, we must be careful not to " 'be so rigorous that the only fact-findings that could withstand review are those established beyond a reasonable

---

5. J.R., K.V.'s father, testified that Emma was using cocaine while she was still in possession of J.K.V. and K.V.

doubt.' " *In re R.A.L.,* 291 S.W.3d 438, 443 (Tex.App.—Texarkana 2009, no pet.) (quoting *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex.2006) (per curiam)).

## III. Sufficient Evidence Established that Termination Was in J.K.V.'s Best Interest

■ To uphold the termination finding, we must determine whether the Department proved, by clear and convincing evidence, that termination of Emma's parental rights was in J.K.V.'s best interest. *See* TEX. FAM.CODE ANN. § 161.001. There is a strong presumption that a child's interest is best served by preserving conservatorship in the natural parent. That presumption can be overcome, however, with clear and convincing evidence to the contrary. *In re R.R.,* 209 S.W.3d 112, 116 (Tex.2006) (per curiam); *In re J.L.B.,* 349 S.W.3d 836, 848 (Tex.App.—Texarkana 2011, no pet.).

▪ ■ A number of factors may be considered in determining the best interest of the child:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.,* 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976)). This list is not exclusive, and there is no requirement to prove any unique set of factors. *Id.* Certainly, it is not necessary to prove all nine factors. *C.H.,* 89 S.W.3d at 27. The analysis of evidence relating to one factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re J.O.C.,* 47 S.W.3d 108, 115 (Tex.App.—Waco 2001, no pet.), *overruled on other grounds by J.F.C.,* 96 S.W.3d at 267 n.39. Additionally, evidence supporting the termination of parental rights is also probative of best interest. *C.H.,* 89 S.W.3d at 28.

■ Due to the young age of J.K.V., his desire cannot be determined. The testimony indicates, however, that J.K.V. was not bonded to Emma, that he had been living with his foster family, and that he was being well cared for. From this evidence, the trial court could infer that J.K.V. would prefer to remain in this stable, loving environment. *See In re U.P.,* 105 S.W.3d 222, 230 (Tex.App.—Houston [14th Dist.] 2003, pet. denied) (considering evidence that child was well cared for by foster family, had bonded with them, and spent minimal time with parent in assessing toddler's desires).

Several factors weigh against Emma's expressed desire to maintain her parental relationship with J.K.V. Foremost among these factors is J.K.V.'s present and future physical and emotional needs. The trial court found that Emma both (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child,"[6] and (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotion-

---

6. *See* TEX. FAM.CODE ANN. § 161.001(b)(1)(D).

al well-being of the child."[7] The trial court further found that Emma "constructively abandoned the child[,] who has been in the temporary managing conservatorship of the Department ... for not less than six months," and that the Department "ha[d] made reasonable efforts to return the child to" her. Further, Emma "has not regularly visited or maintained significant contact with the child" and "has demonstrated an inability to provide the child with a safe environment."[8] Emma did not dispute these findings on appeal.

During the one-year time frame in which Emma had the opportunity to diligently work her service plan for the purpose of being reunited with her children, Emma refused to do so. She would not sign the plan and would not even discuss it. Then, sometime in September 2014, she moved to Mexico, where she remained until only days before the final termination hearing. Although Emma testified that she received drug treatment in Mexico and that she had a job and was renting a house, the totality of her past decisions reflects repeated poor judgment and irresponsible choices and provides a basis on which the trial court could have concluded that Emma could not adequately provide for J.K.V.'s physical and emotional needs, now and in the future, and that she lacked essential parental abilities. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex.App.—Fort Worth 2003, no pet.) (lack of parenting skills, income, and home, and unstable lifestyle considered in determining parent's ability to provide for child's physical and emotional needs); *J.O.A.*, 283 S.W.3d at 346 (considering parent's history of irresponsible choices in best interest determination).

Emma did not articulate any discernable plans for her children and has never provided them with a suitable and safe home.

She continually neglected their physical and emotional needs. Further, J.K.V. is presently in a safe and stable environment with his foster family, which plans to adopt him. His physical and emotional needs are being met by his foster family members, with whom he has bonded.

Based on this record, under the standards as set out above, we conclude that the evidence is factually sufficient to allow the trial court to determine that J.K.V.'s best interest was served by the termination of Emma's parental rights. Therefore, the requirements of Section 161.001(b)(2) of the Texas Family Code have been met. *See* TEX. FAM.CODE ANN. § 161.001(b)(2).

## IV. Conclusion

We affirm the trial court's judgment.

---

**7.** *See* TEX. FAM.CODE ANN. § 161.001(b)(1)(E).

**8.** *See* TEX. FAM.CODE ANN. § 161.001(b)(1)(N).