

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00098-CV

_____

IN THE INTEREST OF J.K.V., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2014-873-DR

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

OPINION

This opinion on rehearing is issued as a substitute for our original opinion issued March 15, 2016.

Laurelio Vero's parental rights to his three-year-old son, Justin, were terminated in a suit, and Vero appeals, arguing only that the evidence was legally and factually insufficient to establish that terminating Vero's parental rights to Justin was in Justin's best interest.[1] *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2015). Because we conclude that the best-interest finding was not supported by factually[2] sufficient evidence, we reverse the trial court's order terminating Vero's parental rights to Justin, and remand the case for a new trial and for further proceedings consistent with this opinion.

The relationship between a parent and child has constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.E.S.*, 471 S.W.3d 915, 919 (Tex. App.—Texarkana 2015, no pet.). In fact, parents' rights to decide how to care for, possess, and control their children are fundamental. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *L.E.S.*, 471 S.W.3d at 919. Before those fundamental rights can be terminated, proof by clear and convincing evidence is required. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *L.E.S.*, 471 S.W.3d at 919. The statutes that provide for involuntary termination

---

[1]One might question whether there was sufficient evidence to support the finding of substantive grounds, but, as Vero does not challenge those findings on appeal, we confine our analysis to the best-interest finding.

[2]Since, as shown in our analysis below, we find at least one factor in our best-interest analysis that supports termination, we find legally sufficient evidence to support that finding. *See Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *In re C.T.E.*, 95 S.W.3d 462, 464 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

are strictly construed in favor of maintaining the natural relationship. *Holick*, 685 S.W.2d at 20; *L.E.S.*, 471 S.W.3d at 919.

Before terminating parental rights, trial courts must find, by clear and convincing evidence, at least one statutory ground for termination and also find that termination is in the child's best interest. *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). Evidence is clear and convincing if it produces in the mind of the trier of fact a firm belief or conviction that the allegations are true. TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In a factual-sufficiency review, evidence that could have reasonably been found to be clear and convincing must be considered. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). The evidence is factually insufficient, if, from an examination of the whole record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in favor of the finding. *L.E.S.*, 471 S.W.3d at 920.

Vero met Justin's mother, Emma, in 2008 in Longview, Texas. She was already a mother of two children, Dustin and Daniel, but was also an abuser of crack cocaine. Vero testified that Emma's drug use greatly upset him and motivated him to fight with her. He stated that he would throw Emma's drugs away when he found them. Eventually, the Child Protective Services Division of the Texas Department of Family and Protective Services (the Department) received a report alleging that Emma was neglecting her children and that "there was some domestic violence between" Emma and Vero. The report prompted the Department to investigate Emma.

3

Jamie Johnson, an investigations supervisor with the Department, testified that he spoke to Vero, who "admitted that he had hit [Emma], that they had had physical altercations on more than one occasion, and that these occurred because she was using drugs." At trial, Vero agreed that he pushed Emma "about three times," during these fights. Johnson testified, and Vero confirmed, that "[Vero] had found a crack pipe in [Emma's] purse, that he had found the children in the motel room with her when she had been using drugs, and that they got into a fight because of that." As a result of the Department's investigation, Dustin and Daniel's father, James Gonzales, obtained custody of the children from Emma in 2012.[3]

Vero and Emma continued their relationship until March 2012, when Vero moved to Houston, Texas. Soon thereafter, Emma called Vero to inform him that she was pregnant and to ask if she could move in with him so that they could resume their relationship. Vero agreed under the condition that she abstain from using drugs because he "knew that the baby could have been affected by it." According to Vero, "Emma she said she was going to have an abortion or that she was going to give him an adoption, but that she wasn't going to let me know either or." Vero stated that Emma left him two weeks after moving in because she would not or could not keep her promise to him to remain drug free. Vero testified that, although Emma said she was going back to Longview, she did not "give [him] an address or [tell him] what house she was going to go to."

---

[3]The Department's brief claims that Vero testified that he lived with Emma "and her older two children in Longview for eight months." While Vero's testimony established that he lived with Emma for an eight-month time period, he did not testify that he was living with Emma's children.

Vero saw Emma in May 2012 for the last time before he decided to move to Mexico.[4] Vero testified that he was not sure that Emma was telling the truth about being pregnant. He explained, "She used to call me saying that [she] was pregnant, then call me [to] let me know that she was not pregnant, then call me and say that I was the father of the baby. Then call me and say that I was not the father of the baby. Next thing I know the baby's born." Emma called Vero on November 4, 2012, to notify him of the child's birth. Vero remained in Mexico because he could not legally enter the United States at that time. He subsequently remarried and had two other children.

In 2014, Emma had another child, Kevin, by another man. In May of that year, the Department sought to terminate Emma's parental rights to Justin and Kevin, for a variety of reasons. As a result of the Department's suit, Emma's parental rights to her children were terminated, and the children were placed into foster care. *In re J.K.V.*, No. 06-15-00063-CV, 2016 WL 269134 (Tex. App.—Texarkana Jan. 22, 2016, no pet. h.). The Department had also petitioned to terminate Vero's parental rights to Justin, assuming that he was Justin's father, but was unable to serve Vero because it did not have his address until September 1, 2015. Sometime in September, Vero was served with the Department's petition, which alleged, among other things, that he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child" and

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

---

[4]Vero, who had no criminal history, was not deported.

> (i) the department has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM. CODE ANN. § 161.001(b)(E), (N) (West Supp. 2015).

Vero, who was twenty-five years old, was first informed that he had the right to counsel on September 23, 2015. On October 14, 2015, Vero appeared at a permanency hearing setting the matter for trial October 20, 2015.[5] On October 15, 2015, Vero filed a counter petition to adjudicate parentage.

At the October 20 hearing, Vero appeared telephonically to testify to the facts detailed above and to argue (1) that he had not endangered Justin because he had never seen him and (2) that Emma left him and that "[y]ou cannot abandon someone who has already left." Vero pointed out that he had only been served with the Department's petition the month before the final hearing and that, as a result, the Department had never offered him a service plan.[6] He further testified that he

---

[5]Vero and Emma never married, and Vero had not signed Justin's birth certificate or an acknowledgement of paternity and was not otherwise found to be Justin's father.

[6]Vero's counsel made the following argument during closing:

> Judge, I'll start by saying that [Father]'s testimony was that early on in this case, he inquired as to whether he could get an attorney appointed for him, and was told that since he was in Mexico that could not happen. Only after he contacted Mr. Settle's office was he made aware of that, and that only happened September 23rd of 2015, less than 30 days before trial. I had no time to conduct discovery.

Counsel had not asked for a continuance. *See* TEX. R. CIV. P. 245 (forty-five-day notice required before first setting of contested case for trial unless parties agree otherwise).

6

wanted to take care of Justin and would be able to do so. Vero stated that he lived with his wife and two other children in a two-story house in Mexico that had three bedrooms, two bathrooms, a living room, dining room, and a kitchen. He told the trial court that his father still lived in Longview, Texas, and would be able to facilitate the child's transition to Mexico.

Department investigator, Jessica Galindo, testified that the Department's investigation of Emma with respect to Justin and Kevin began when she received a report that Justin had fallen and required medical care, but was left untreated. Galindo found Emma living in a battered women's shelter "following an incident where [Emma] was abused by a man living in a home where she was renting a room." Galindo said that Justin was malnourished and had a sinus infection and a mild concussion from his fall.

Galindo claimed that, when she was able to get in touch with Vero, Vero stated that Emma was crazy and was doing drugs. According to Galindo, Vero identified himself as Justin's father and stated that he left Emma when she was around three months pregnant with Justin. "He stated that he was interested in having his son, but he was living in Mexico." Galindo did not discuss the issue of providing Vero with a service plan, but claimed that the conservatorship worker may have done so. Because he was in Mexico, Galindo testified that Vero was not available to take care of Justin.

The Department's caseworker, Dionne Jordan, stated that she spoke with Vero sometime in July 2015 during the pendency of the Department's case against Emma. The following occurred during her one conversation with Vero:

7

A       During our conversation, [Justin] was having day visits with [Kevin] and [Kevin]'s father. And I wanted him to understand that the plan was that he be allowed to remain with his brother and his brother's father.

Q       What was his response to that plan?

A       Initially he asked if I could just help get him into the United States legally. If not, he wanted [Justin] to remain in foster care.

Jordan testified that Vero did not furnish the names of any relatives who Justin could be placed with. Jordan did not specify whether the placements were temporary and would remain in place until the trial court made a determination as to whether Emma's parental rights should be terminated. Although Vero claimed Justin as his son, Jordan testified that she did not prepare family service plans for Vero because his name was not on Justin's birth certificate and he had not signed any acknowledgment of paternity. She also stated, "[H]e continued to talk about coming here and not being interested in working services while in Mexico." However, Jordan also testified that she was not sure whether the Department could provide Vero with any services in Mexico, and the record establishes that the Department offered no services to Vero. Jordan did not claim that she had spoken with Vero since he was served with the Department's suit against him. During cross-examination, Jordan admitted that Vero had answered the suit the week before the final hearing and that he wanted the trial court to establish paternity.

Justin's foster mother, Becky Easley, testified that Justin had been living with her for eighteen months. According to Easley, Justin was malnourished and experiencing emotional outbursts and nightmares when he first arrived at her home. Since being placed in Easley's home, Justin had gained weight, was healthy, and had flourished. Justin was going to regular checkups and dental visits. Easley testified that Justin attended a Mother's Day Out program two days a

8

week to help him socialize and provide him with security. Easley stated that Justin spends time with Kevin and her own family in a supportive environment. Easley testified that she wanted to adopt Justin and that Justin did not know his father.

After hearing this evidence, the trial court adjudicated parentage and determined (1) that Vero had engaged in conduct or knowingly placed Justin with people who engaged in conduct that endangered Justin's physical and emotional well-being, (2) that Vero had constructively abandoned Justin, who had been in the Department's care for not less than six months, because the Department made reasonable efforts to return Justin, Vero had not regularly visited or maintained significant contact with Justin, and Vero had demonstrated an inability to provide Justin with a safe environment, and (3) that termination of Vero's parental rights was in Justin's best interest. As we mentioned, Vero challenges on appeal only the third finding.

There is a strong presumption that a child's interest is best served by preserving the relationship between parent and child. That presumption can be overcome, however, with clear and convincing evidence to the contrary. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.).

A number of factors may be considered in determining the best interest of the child:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

9

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list of so-called *Holley* factors is not exclusive, and there is no requirement to prove any unique set of factors. *Id*. The analysis of evidence relating to one factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *overruled on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 n.39 (Tex. 2002). Additionally, evidence supporting the termination of parental rights is also probative of best interest. *C.H.*, 89 S.W.3d at 28.

*Justin's Desires.* Justin was two years old at the time of trial. Due to Justin's young age, his desire cannot be determined. The Department argues that Justin had never met Vero, that he had been living with his foster family for eighteen months, and that he was being well cared for. They urge us to find that Justin would prefer to remain in this stable, loving environment. However, "the best interest of a child is not a comparative contest in which a non-parent party can earn the right to terminate a parent's parental rights so the non-parent might adopt the child." *In re A.L.D.H.*, 373 S.W.3d 187, 194 (Tex. App.—Amarillo 2012, pet. denied) (citing *In re C.E.K.*, 214 S.W.3d 492, 498–99 (Tex. App.—Dallas 2006, no pet.); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) ("[T]he best interest standard does not permit termination merely because a child might be better off living elsewhere."). The Department did not introduce any evidence to answer the question of whether Justin would want to live with Vero in Mexico. Accordingly, the first *Holley* factor is neutral. *See E.N.C.*, 384 S.W.3d at 808; *In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.).

10

*Justin's Needs.* Next, there was no evidence suggesting that Justin's emotional and physical needs were different than those of any child. Vero testified that he is married, has two other children, and provides a decent home for those children. Although the Department bore the burden in this termination case, it did not present any evidence suggesting that Justin's needs would go unmet if he lived with Vero. Accordingly, the second *Holley* factor weighs against termination of Vero's parental rights. *See E.N.C.*, 384 S.W.3d at 808.

*Justin's Endangerment.* Under the third *Holley* factor, the Department was required to present evidence that Justin would be placed in emotional or physical danger if he were to live with his father. Arguing that it met this factor, the Department cites to Vero's admission that he had a physical altercation with Emma, before she was pregnant with Justin, when confronting her about her drug use. The record demonstrates that Emma's drug problem was the cause of Vero's altercations with her and that the altercations were Vero's attempts, however misguided, to prevent Emma's drug use. Vero's relationship with Emma ended in 2012, before Justin was born.[7] Under these circumstances, we will not surmise that Vero's actions toward Emma demonstrated, by clear and convincing evidence, that Justin would be placed in emotional or physical danger if he lived with Vero. We find that the third *Holley* factor weighs against termination.

*Evaluating Parenting Abilities.* As to the fourth *Holley* factor, the Department argues that the fact-finder was free to believe Galindo's testimony that Vero stated he abandoned Emma while

---

[7] We note that the Department argues both that Vero "continued to maintain a relationship with [Emma] despite her drug use" and that he "abandoned [her] while she was three months pregnant."

she was pregnant and that this evidence demonstrated that Vero had poor parental abilities.[8] On the other hand, a parent's imprisonment does not alone establish best interest in a termination proceeding. *See In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). By analogy, proof that a parent is outside the United States and cannot return should not automatically establish best interest. Still, there is evidence that Vero may not have done all he could to return and exercise parental duties over Justin. Accordingly, we find that the fourth factor weighs slightly in favor of terminating Vero's parental rights.

*Assistance for Caretakers.* As to the fifth *Holley* factor, the Department presented no evidence that Vero would require assistance if Justin were to live with him. The record established that the Department provided no services for Vero and were not sure whether services could be provided to him in Mexico. "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808. We find that the fifth *Holley* factor weighs against termination of Vero's parental rights.

*Plans and Stability of Caretakers.* As to the sixth and seventh *Holley* factors, the Department offered no evidence that Vero's home was not a stable one. Instead, it focused on evidence showing that Easley wanted to adopt Justin and that Justin was thriving in her home. However, Vero's plan for the child was to have his father facilitate Justin's transition to Mexico

---

[8]The Department also argued that Vero's admitted knowledge of Emma's drug use around Dustin and Daniel and failure to take action to prevent those children from exposure to Emma's drug use indicated that he did not have the parental abilities to care for Justin. However, the evidence at trial did not establish that Emma used drugs in front of Dustin and Daniel. Instead, it established that, while the children were with Emma, Emma's purse contained a crack pipe and that Vero confronted Emma about this finding.

so that he could live with his half-siblings in Vero's two-story, three-bedroom home. The Department did not indicate why Vero's plan for Justin would be unsuitable. "[B]ecause the Department never assessed [Vero]'s situation in Mexico, there is a lack of evidence establishing the instability of [Vero]'s home in Mexico." *Id.* Thus, we find that the sixth and seventh *Holley* factors weigh somewhat against termination.

*Vero's Behavior.* Next, we discuss the last two *Holley* factors, Vero's acts or omissions that may indicate the existing parent-child relationship is not a proper one and any excuse for such acts or omissions. We first consider the extent to which the grounds for termination inform these two *Holley* factors.

The trial court determined that Vero had constructively abandoned Justin under Section 161.001(b)(1)(N) of the Texas Family Code. That ground requires the Department to make reasonable efforts to return the child and requires findings that the parent has not maintained significant contact with the child and has demonstrated an inability to provide the child with a safe environment. TEX. FAM. CODE ANN. § 161.001(b)(1)(N) (West Supp. 2015). Yet, this record established that (1) Vero was served with the petition to terminate his parental rights sometime in the month before the termination hearing, (2) Vero was told that the Department's plan was for Justin to remain in foster care during the pendency of the Department's suit against Emma, (3) the Department offered no services to Vero, and (4) there was no evidence establishing that Vero was unable to provide Justin with a safe and stable environment. Accordingly, the finding of termination under Ground N does not support the best-interest finding.

13

The other ground for terminating Vero's parental rights required the Department to prove that Vero engaged in conduct or knowingly placed Justin with Emma, who engaged in conduct which endangered[9] Justin's physical or emotional well-being. On this point, the Department argues that Vero and Emma's relationship "consisted of multiple incidents of domestic violence," that Vero chose to remain in a relationship with Emma despite her drug use, and that Vero did nothing to protect Emma's older children from her drug use. The Department also argues that Vero left for Mexico knowing that Emma was a pregnant drug addict.

At trial, Vero admitted that his fights with Emma had on occasion become physical.[10] Johnson testified that Vero admitted that he hit Emma. The record also demonstrates that Vero chose to remain in a relationship with Emma, in spite of her drug use. The Department argues that Vero did nothing to protect Dustin and Daniel from Emma's drug use, but Vero testified that he threw Emma's drugs away and that he confronted Emma on the occasion where he saw her crack pipe in her purse while she was in Dustin and Daniel's presence. In any event, Vero did not contact law enforcement or the Department, even after he knew that Emma was pregnant. The evidence also supports the conclusion that Vero was in a no-win situation given Emma's drug use: either fight her addiction or leave her in it. In the end, the evidence does, however, support a finding that the parent-child relationship might not have been appropriate. However, we consider Vero's excuses for his behavior.

---

[9]The term "'endanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *E.N.C.*, 384 S.W.3d at 803.

[10]We note that the record does not indicate that Vero engaged in any physical altercation with Emma after he discovered she was pregnant with Justin.

Vero tried to reform Emma and care for her while she was pregnant with Justin by requiring her to remain drug-free in Houston. As a consequence, Emma left Vero and did not inform him where she was going. Vero testified that he did not hear from Emma until Justin's birth, which occurred after he left for Mexico. Emma's parental rights to Justin were terminated, and nothing suggests that Vero intends to continue any relationship with Emma. While an offense occurring before a person's child is born can be a relevant factor in establishing an endangering course of conduct, the Department must introduce evidence concerning the offense and establishing that the offense was part of a voluntary course of conduct that endangered the child's well being.[11] *E.N.C.*, 384 S.W.3d at 804. Given Vero's acts and omissions, considering Vero's excuses for his behavior, we find that the Department failed to prove, by clear and convincing evidence, that the acts and omissions occurring before Justin's birth indicated that the existing parent-child relationship is not proper. Accordingly, we find that the ninth factor weighs against termination of Vero's parental rights.

"Termination of parental rights requires proof by clear and convincing evidence. This heightened standard of review is mandated not only by the Family Code . . . , but also the Due Process Clause of the United States Constitution." *Id.* at 802 (citation omitted) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54)). "[P]arental-rights termination impacts not only the fundamental liberty interests of the parent, but also the fundamental liberty interests of the child on whose behalf the State's action is initiated." *In re K.D.*, 471 S.W.3d 147, 167 (Tex. App.—Texarkana 2015, no

---

[11]Our analysis here is not meant to determine whether the evidence was legally or factually insufficient to support termination of Vero's parental rights since Vero's appellate counsel made no effort to argue these points. Instead, our discussion involves whether the Department has shown whether Vero's acts and omissions demonstrated that the existing parent-child relationship was inappropriate.

pet.). The fourth and eighth *Holley* factors weigh in favor of terminating Vero's parental rights. However, the first *Holley* factor is neutral, and the second, third, fifth, sixth, seventh, and ninth factors all weigh against terminating Vero's parental rights. Based on this record, which established that (1) Vero's parental rights were terminated the month after he was served with the Department's suit, and (2) the Department made no effort to offer any services to Vero, we conclude that, when we weigh the *Holley* factors, the evidence is factually insufficient to support the determination that Justin's best interest was served by terminating Vero's parental rights. Therefore, we sustain Vero's point of error.

"Rules 43.3 of the Texas Rules of Appellate Procedure states that '[w]hen reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when: (a) remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial.'" TEX. R. APP. P. 43.3; *In re K.D.*, 471 S.W.3d 147, 178 (Tex. App.—Texarkana 2015, no pet.). We reverse the trial court's order terminating Vero's parental rights to Justin and remand the case for a new trial and for further proceedings consistent with this opinion.


Josh R. Morriss, III
Chief Justice


Date Submitted:     April 19, 2016
Date Decided:       April 20, 2016

16