**Opinion issued July 24, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00065-CV

————————————

## IN THE INTEREST OF B.D.A., L.A.A.-M., and J.X.A, Children

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2014-06547J

## O P I N I O N

This is an appeal from a decree terminating the parental rights of an incarcerated father with respect to his three biological children, B.D.A., L.A.A.-M., and J.X.A. The father contends that the evidence was insufficient to support the trial court's decree.

Rather than supporting a firm belief or conviction that termination would be in the children's best interest, the record before us raises more questions than it answers. Did the Department of Family and Protective Services make reasonable efforts to provide appropriate services to facilitate the children building or maintaining a healthy relationship with their incarcerated father? Were all the children's eligible relatives considered as possible kinship placements? And what is the plan for the children to achieve permanency, particularly in light of the separation of three siblings into separate placements, with no evidence of their placement history in foster care or of prospective adoptive placements?

The children can't live with their father in prison, but that fact alone is not sufficient to justify terminating their last formal legal connection to their natural family. Evaluating the evidence in light of the *Holley v. Adams* factors used to evaluate whether termination of parental rights is in the best interest of the children,[1] we conclude that the Department failed to carry its burden of proof by clear-and-convincing evidence. We reverse and remand to the trial court for further proceedings.

## Background

For most or all of the lives of the three children involved in this parental-termination proceeding, their father has been in jail or prison. The children were

---

[1] 544 S.W.2d 367, 371–72 (Tex. 1976).

removed from the mother's custody, and the Department of Family and Protective Services filed a petition seeking to terminate the parental rights of both the mother and the father. Just before trial, the mother voluntarily relinquished her parental rights. Our review of the sufficiency of the evidence on appeal is limited to the information received into evidence at trial (which is comprehensively detailed in this opinion), as well as any matter the trial court properly could have judicially noticed.

Trial was held before a master on December 15, 2016.[2] Before offering witness testimony, the parties offered exhibits into evidence. The mother tendered into evidence her affidavit of voluntary relinquishment of parental rights. The Department then offered nine exhibits into evidence. The first six exhibits were the children's three birth certificates and three letters certifying that each child had not been the subject of a prior suit affecting the parent-child relationship. The Department also offered the father's judgment of conviction for aggravated robbery with a deadly weapon, a family service plan for the father, and the trial court's order establishing the father's parentage.

The father's family service plan was dated July 29, 2015, and the Department's "Permanency Goals" for each child were identified as "Family

---

[2] *See* TEX. GOV'T CODE § 54.808(1) (allowing parental-termination cases in Harris County juvenile courts to be referred to a master); *id.* § 54.810 (establishing powers of master).

Reunification."[3] The plan included the following description of the "reason for Child Protective Services involvement":

> On June 16, 2015, the Texas Department of Family and Protective Services (DFPS and/or the agency) received a referral for neglectful supervision of [L.A.A.-M.], by his mother, [S.M.]. According to the referral the child, [L.A.A.-M.], sustained a head scalp injury from a dog bite while at [the mother's] friend's house party and at the time of the incident the mother's whereabouts were unknown. The referral indicated the mother appeared to be intoxicated and attempted to drive herself to the hospital but was stopped by EMT, asked to ride in the EMT truck, and mother agreed. At the hospital, the mother's speech was slurred and she appeared lethargic. According to the referral, while at the hospital, it was very difficult to wake the mother and a doctor tried pressing on her chest to wake her up. It was reported that the mother fell asleep twice while answering hospital staff questions. . . . According to the intake report, while moving [the] child to the new hospital room, it took two nurses to physically assist mother to the new room because the mother could not walk without wobbling. The TXDFPS requested to be named Emergency Temporary Managing [Conservator] of the children. At this time, the mother, [S.M.], has a C-SCAL alert out of the 313th District Court in Harris County Texas (Cause# 2014-06547J) because she has a history of fleeing from DFPS in the past.[4] The child, [L.A.A.-M.] was discharged. Clear Lake Hospital was cooperative until CPS could find suitable placement for the child *due to him being a[u]tistic*; and the

---

[3] The document defined the goal of "Family Reunification" as: "The parent gets the child back. This may be the parent the child was living with before DFPS care or it may be a parent the child was not living with."

[4] The appellate record includes an "Ex Parte Order to Place Family on Child Safety Check Alert List." *See* TEX. FAM. CODE § 261.3022 (requiring the Department of Public Safety to "maintain a child safety check alert list . . . to help locate a child or the child's family" for purposes of "(1) investigating a report of child abuse or neglect; (2) providing protective services to a family receiving family-based support services; or (3) providing protective services to the family of a child in the managing conservatorship of the department").

fact that the mother is not an appropriate caregiver for him at this time. The *relative placement* for the other two children, [B.D.A.] and [J.X.A.], could no longer take care of them. Due to there being no other appropriate placements that have been identified to care for the three children and ongoing danger, TXDFPS was granted [temporary managing conservatorship].

(Emphasis supplied.) The family service plan form included spaces to identify "family strengths and supports" and "community supports," each of which were filled out with the words "Not Applicable."

Under the heading "Family and CPS Concerns Related to Risk and Safety," the family service plan identified the following "Initial Concerns" as of July 29, 2015:

All children are 5 years old and under and is unable to protect themselves [if] danger occurs. [L.A.A.-M.] is *autistic and can be violent if his mother is not in his sight*. [L.A.A.-M.] is non-verbal.

The mother, [S.], stated she suffers from anxiety, depression and insomnia. [The mother] stated she doesn't have any medication because she doesn't have the funds to get her medication. [The mother] tested positive for cocaine and marijuana by hair follicle. [L.A.A.-M.] is autistic, but can't take any medication because he's too young.

It's unknown if [the mother] left her children to inappropriate caregivers because she failed to provide information about the whereabouts of her children.

[The mother] disclosed she was a victim of sexual abuse by a family member. There were 4 previous CPS cases . . . 1 cause her children to be removed, 2 unable to complete cases because the family couldn't be located and 1 physical abuse case that was ruled out. It's unknown if [the mother] has her children exposed to people who's not appropriate.

It's unknown where the children were living during the investigation. [The mother] stated they were *living with a cousin*, but wasn't able to provide an address of where the cousin lived. It's unknown if the home was unsanitary or clean. [The mother's] family support is unknown because she stated *she doesn't associate with her family* since her last CPS case when admitted to the Santa Maria Hostel.

[The mother] stated she didn't want to be involved with CPS and only went to the hospital to [have] her son treated for dog bite injuries, but [not] for CPS to take her children. [The mother] has been untruthful about where her children were.

[The mother] had limited outside support that can help her with her children due to communications abandoned and family conflict.

(Emphasis supplied.) The plan identified the following "Service Plan Goals

(Changes Needed to Reduce Risk)":

Parent will demonstrate an understanding of and ability to provide for the special needs of the child. Parent will demonstrate the willingness and ability to protect the child from harm.

Parent will learn new behaviors that promote cooperation, stability, and a sense of self-worth among family members. Parent will actively participate in therapy to understand how their own abuse/neglect as a child may impact their current parenting style.

Parent will demonstrate an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the child. Parent will demonstrate the ability to put the needs of the children ahead [of] their own.

Parent will build a support network that will help ensure the safety of the child. Parent will demonstrate ability to protect the child from harm.

Family will understand and support efforts to deal with issues related to their prior maltreatment; including but not limited to counseling, medical care, or drug treatment of the child.

Parent will maintain housing that is safe and free of hazards and provide protection, food, and shelter for the child and family. Parent will demonstrate an ability to use willing and appropriate friends and relatives to help with the child.

Parent will actively cooperate in fulfilling the agreed upon safety plan in order to control the risk of abuse or neglect.

Under the heading "Tasks and Services," the plan included one item that was "assigned to" the parents:

[F]ather . . . will submit to DNA testing. Upon verification, the Family Plan of Service may be modified. [Father] is currently incarcerated with a projected release date of July 14, 2027. *Services will be requested if there is a sooner release date.*

(Emphasis supplied). The plan identified a person to be contacted by a parent for information about the family service plan or the children. The contact person was identified as Deitra E. Smith, and a phone number was provided.

The family service plan included a page for the parents to acknowledge receipt of the plan. It included signature lines for up to four parents, a caseworker, and a supervisor. The document offered into evidence was signed on August 6, 2015 by caseworker Bridgette Sharkey and a supervisor, but it was not signed by any parent.[5]

---

[5] The signature page which lacked the parents' signatures included various admonitions, including the Department's determination of an emergency condition in the family requiring services, the importance of the family service plan document, the criteria for evaluating parental progress on the plan, sources of information for evaluation of parental progress, the right to

7

The Department presented two witnesses. Caseworker Sharkey testified that at the time of trial, B.D.A. was seven years old, L.A.A.-M. was five years old, and J.X.A. was four years old. DNA testing confirmed that each is the child of the appellant father.

The caseworker initially was asked to explain why it was in the children's best interest to terminate the mother's parental rights based on her voluntary relinquishment. She explained that the Department attempted "numerous times to work out arrangements to support the primary goal at the time of family reunification." The caseworker said the care of the children "started deteriorating" when they "were placed with the mother." She testified that the mother "was not able to physically, financially, or emotionally be there for the children."

The caseworker said the children were "actually getting more support in the placement that they are in." She noted that the mother tested "positive again for drugs when she went through the program once all of the requests and referrals were made for drug services, individual therapy," and "none of the dangers were alleviated that brought the children into care." The caseworker then stated, "along with, of course, [L.'s] neglectful supervision."[6] She concluded: "And so, because

---

request a review or a change of the plan or an evaluation of parental progress, and the right to request translation services.

[6] The father and L.A.A.-M. share the same first name. The record is ambiguous as to whether the caseworker's mention of "[L.'s] neglectful

8

of that we believe that the children's best interest would be to stay in the placements that they are in and eventually become adoptive into a permanent placement where they will be stable and their needs can be met."

With respect to the father, the caseworker confirmed that his paternity was proved by DNA test. Asked whether "throughout this case" she had "reached out to" the father, she agreed and testified that "he was mailed a family plan of service as well as a letter to notify him of the case." The Department's lawyer then asked, "Has he reached out to you?" She responded, "No." She further agreed with the lawyer that, to her knowledge,[7] the father had not "sent any letters, any cards to his children," and he was sentenced in 2013 to a 15-year prison sentence, meaning it would be "over two years before he gets out." She confirmed that she was asking the court to terminate the father's parental rights, that she did not believe it shows "good parenting skills to engage in criminal conduct," and that "a parent who engages in criminal conduct could endanger the children's safety."

---

supervision" was a reference to the mother's neglectful supervision of L.A.A.-M. or to the father's neglectful supervision of the children. For purposes of our legal analysis, we view the evidence in the light most favorable to the judgment, and we therefore presume the testimony alleged the father's neglectful supervision of the children.

[7] The caseworker was not qualified as a representative of the Department for purposes of her trial testimony, and she did not testify about any review of Department records in preparation for her testimony. *See, e.g.*, TEX. R. EVID. 803(7), (10) (hearsay exceptions permitting evidence of the absence of a record of a regularly conducted activity or the absence of a public record).

9

With respect to the children's current foster placements at the time of trial, the caseworker testified: "The children are all in separate placements. They are all in foster homes. [L.A.A.-M.] is close to Austin and the other two children are in Harris and Fort Bend County." She confirmed that "the children are doing well in each of their placements," and she testified that "all of their needs are being met in each individual placement." With specific reference to L.A.A.-M., the caseworker confirmed that he "has special needs." She testified: "He has moderate hearing loss in one ear, severe hearing loss in the other ear. He's not completely deaf, but there is severe hearing damage." She agreed with the Department's lawyer's suggestion that "his current placement is able to, in fact, much better than any other placement, address those needs." She concluded by agreeing with the lawyer that termination of parental rights "would provide more permanency for the children." There were no objections to any of the caseworker's direct testimony.

On cross-examination by the father's lawyer, the caseworker conceded that she had not ever "personally spoken with the father."

She then was asked about the father's receipt of the family plan of service:

Q.      And do you have any evidence that he actually received the family plan of service besides just putting it in the mail?

A.      We do mail certified.

Q.      Did you, by chance, bring a receipt of the certified mail?

10

A.          No. But *I did speak with his sister* as well as—

Attorney:   Objection, Judge. Hearsay.

A.          Oh, okay.

Q.          So we don't have any evidence for the Court to see that
            he actually got his service plan, do we?

A.          No.

(Emphasis supplied.[8])

---

[8]    The father was represented by his appointed counsel at an August 20, 2015 status hearing. At that hearing, the court found that the father had not reviewed the family service plan, that he did not understand it, and that he had not been advised that unless he was "willing and able to provide the children with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan," his parental and custodial duties and rights could be "subject to restriction or to termination" or the children might not "be returned to him." In the same order, the family service plan, which had been filed with the court, was "incorporated by reference" into the status hearing order "by reference as if the same were copied verbatim" in the order, and expressly was made an order of the court.

An attorney ad litem appointed to represent the interests of a parent has a duty "to ensure competent representation at hearings." TEX. FAM. CODE § 107.0131(a)(1)(C). This duty includes obtaining and reviewing "copies of all court files in the suit during the attorney ad litem's course of representation." *Id.* § 107.0131(a)(1)(C)(i). An attorney ad litem also has a duty to "become familiar with the American Bar Association's standards of practice for attorneys who represent parents in abuse and neglect cases." *Id.* § 107.0131(a)(1)(I). Among other things, the ABA's standards require, as a basic obligation, that a parent's attorney shall "[p]rovide the client with copies of all petitions, court orders, service plans, and other relevant case documents, including reports regarding the child except when expressly prohibited by law, rule or court order." STANDARDS OF PRACTICE FOR ATTORNEYS REPRESENTING PARENTS IN ABUSE AND NEGLECT CASES (CTR. ON CHILDREN AND THE LAW, A.B.A. 2006),

11

No other questions were asked of the caseworker by the father's lawyer, or by the

guardian ad litem for the children.

---

https://www.americanbar.org/content/dam/aba/publications/center_on_childr en_and_the_law/parentrepresentation/ABA-Parent-Attorney-Standards.authcheckdam.pdf [hereinafter, *ABA Standards*] (citing MODEL RULES OF PROF'L CONDUCT r. 1.4 (AM. BAR ASS'N 2003)); Tex. Disciplinary Rules of Prof'l Conduct R. 1.03 (lawyer's duty of communication with a client).

More generally, a parent's attorney also shall "be aware of the unique issues an incarcerated parent faces and provide competent representation to the incarcerated client." *ABA Standards*, *supra*, at 17. "The parent's attorney must be particularly diligent when representing an incarcerated parent." *Id*. Compliance with a family service plan is one of the "unique issues" that an incarcerated parent faces:

> Obtaining services such as substance abuse treatment, parenting skills, or job training while in jail or prison is often difficult. The parent's attorney may need to advocate for reasonable efforts to be made for the client, and assist the parent and the agency caseworker in accessing services. The attorney must assist the client with these services. Without services, it is unlikely the parent will be reunified with the child upon discharge from prison.

*Id*.

The lack of evidence that the Department engaged with the father in an attempt to provide him services was important. *See, e.g.*, LEONARD EDWARDS, REASONABLE EFFORTS: A JUDICIAL PERSPECTIVE 66–68 (2014). But this issue should not have led to any implication that the father never "actually got his service plan," in light of the attorney ad litem's duties to his client. Providing a copy to the father was at least equally the responsibility of his attorney representative.

The second and final witness at the termination trial was Barbara Grimmer, who testified when the Department called "Child Advocates" as a witness. Grimmer's precise role and the basis for her personal knowledge about the case were not explained.[9] The Department's lawyer asked: "Barbara how long have you been on this case?" She testified: "We began working on this case November 13th of 2015."[10] The Department asked: "You've seen the kids in their different placements?" Grimmer responded: "Yes, between my volunteer and I." The Department then asked, "And have you seen their current placements?" Grimmer responded, "The volunteer has seen the two children here," referencing B.D.A. and J.X.A. She further testified that Child Advocates had not "been to the Austin placement" for L.A.A.-M. Instead, Grimmer said that the volunteer had "been communicating on a regular basis with the public school there, the school for the deaf, the caregiver, and the educator on his special school placement here and making sure that they are all in touch with one another."

---

[9]    Like the caseworker, Grimmer was not formally qualified as a representative of Child Advocates for purposes of her testimony, and she did not testify about any review of records in preparation for her trial testimony.

[10]    The clerk's record shows that "Child Advocates, Inc. and its designee(s)" were appointed as guardian ad litem to represent the best interest of the minor children in an order signed and filed on October 21, 2015. On the report filed by Child Associates before trial, Grimmer was shown as a "cc:" recipient and identified as an "Advocacy Coordinator." Each Child Advocates report was signed by another person, who did not appear or testify at trial.

Grimmer testified that termination of both parents' parental rights was in the best interest of all three children. She explained:

> We did work with the mother, and she wasn't able to alleviate any of the concerns that brought the children into care including drug use, instability, emotional instability, lack of a support system.

> She does have a pattern of CPS involvement and of running from CPS and not following through although she did work hard initially on this case, she wasn't able to keep up that stability and that sobriety. The kids are now—they are young. [L.A.A.-M.] is in a placement that . . . hopefully will become adoptive. It can meet all of his needs and the other two children are basic level children that deserve to find permanency.

On cross-examination, the mother's lawyer asked: "Do the children know what's going on?" Grimmer responded that they knew they were removed from their mother, "the caregiver explained to them that Mom was sick," and she did not know if the children knew "anything beyond that." She testified that Child Advocates agreed there should be "a goodbye visit between mother and the children," to provide "good closure for the kids."

Grimmer asked that the court retain Child Advocates on the case "[u]ntil permanent placements are found." She gave no testimony about the father, and the father's lawyer did not cross-examine her.

The father had no witnesses and rested his case without offering any evidence.

In its closing argument, the Department argued that the father's criminal conduct endangered the children. The lawyer further asserted: "He has not written, called, or financially supported his children since they've been in the Agency's care. He failed to do any services on the family service plan that was ordered by this Court." The Department also argued that the father would remain in prison more than two years from the beginning of the case.

The father's attorney argued that the court should make no findings pertaining to the father, suggesting there could be no basis for an endangerment finding against the father because he had been incarcerated since 2013, before the children were removed from their mother's care.

The trial court found that the father had committed the predicate acts of endangerment, constructive abandonment, failure to comply with a court order, and having been convicted of an offense resulting in imprisonment and inability to care for his children for not less than two years from the date of filing the petition.[11] The trial court also found that termination of the father's parental rights was in the best interest of the children.[12] Having made these findings, the trial court

---

[11]    *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O), (Q).

[12]    *See id.* § 161.001(b)(2).

terminated the father's parental rights to B.D.A., L.A.A.-M., and J.X.A.[13] The Department was named sole managing conservator of the children.

Two weeks after the entry of the trial court's final decree of termination, the father's appointed trial counsel filed a motion to withdraw and for appointment of appellate counsel. On the same date, he filed a notice of appeal. These were the only two filings made by the father's appointed trial lawyer and included in the appellate record.

The trial court appointed a new attorney ad litem to represent the father on appeal. The father and the Department submitted appellate briefs, and the appeal was set for oral argument. In the course of oral argument, the father's appellate lawyer conceded that he had never communicated with the father about the appeal.[14] We abated the appeal and remanded the matter for the district court judge

---

[13] The master signed the judgment. *See* TEX. GOV'T CODE § 54.816. The district court judge adopted the order of termination. *See id.* §§ 54.817–.818.

[14] An attorney ad litem appointed to represent the interests of a parent has a duty, within a reasonable time after the appointment, to interview the parent, unless the parent's location is unknown. TEX. FAM. CODE § 107.0131(a)(1)(A). The right to counsel under Section 107.013(a)(1) applies through the exhaustion of appeals under Section 107.016(2)(B). *In re P.M.*, No. 15-0171, 2016 WL 1274748, at *3 (Tex. Apr. 1, 2016). Lawyers appointed to handle appeals in parental-termination proceedings are subject to the duties of an attorney ad litem for a parent, as described in Section 107.0131. *See* TEX. FAM. CODE § 107.0131(a)(1)(B) (attorney ad litem shall "investigate the facts of the case"); *id.* § 107.0131(a)(1)(G) (attorney ad litem shall "meet before each court hearing with the parent," unless the court finds that the attorney ad litem has shown good cause why

to hold a hearing in which the father would participate. We ordered the judge to determine whether the father wished to pursue an appeal, and to make any findings of fact, conclusions of law, or other recommendations that the trial court deemed appropriate. The father participated in the hearing by telephone and confirmed his desire to appeal. We reinstated the appeal the next day. There have been no post-submission filings by the father's appellate counsel.

**Analysis**

On appeal, the father challenges the legal and factual sufficiency of the evidence to support the termination of his parental rights. As relief, he requests a reversal of the trial court's judgment and a remand "for the sole purpose of conducting an evidentiary hearing on the issue of conservatorship." Because of the

---

compliance is not feasible, or on a showing of good cause the attorney ad litem has been authorized to comply by conferring with the parent, as appropriate, by telephone or video conference); *ABA Standards*, *supra* note 8, at 13 (the parent's attorney shall "[p]rovide the client with contact information in writing and establish a message system that allows regular attorney-client contact," shall "[m]eet and communicate regularly with the client well before court proceedings," and shall "[c]ounsel the client about all legal matters related to the case"); *id.* at 19 (the parent's attorney shall "[i]nterview the client well before each hearing, in time to use client information for the case investigation"); *id.* at 31 ("Oral argument of the appeal on behalf of the client should not be waived, absent the express approval of the client, unless doing so would benefit the client.").

natural family connections at stake,[15] we strictly scrutinize termination proceedings on appeal.[16]

In proceedings to terminate the parent-child relationship, the Department must establish by clear-and-convincing evidence that the parent committed one of the acts or omissions listed in Family Code Section 161.001(b)(1) and that termination is in the best interest of the child.[17] Both elements must be established, and the failure to prove either a predicate act or that termination is in the best

---

[15]    A parent's right to the care, custody, and control of his children has been characterized as a precious liberty interest worthy of constitutional protection. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). Termination of parental rights also impacts "the fundamental liberty interests of the child on whose behalf the State's action is initiated." *In re K.D.*, 471 S.W.3d 147, 167 (Tex. App.—Texarkana 2015, no pet.); *see also Santosky*, 455 U.S. at 760, 102 S. Ct. at 1398 ("the child and his parents share a vital interest in preventing erroneous termination of their natural relationship"); *id.* at 788 n.13, 102 S. Ct. at 1412 n.13 (Rehnquist, J., dissenting) ("The child has an interest in the outcome of the factfinding hearing independent of that of the parent."); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) ("Both the parent and the child have a substantial interest in the accuracy and justice of a decision."). Texas courts consistently have recognized a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *See In re G.M.*, 596 S.W.2d 846, 846–47 (Tex. 1980); *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *Herrera v. Herrera*, 409 S.W.2d 395, 396 (Tex. 1966); *Legate v. Legate*, 87 Tex. 248, 252 (1894).

[16]    *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[17]    TEX. FAM. CODE § 161.001(b).

interest of the child will prove fatal to the Department's case.[18] The same evidence may be probative of both a predicate act and the best interest of the child.[19] In the parental-termination context, the clear-and-convincing standard is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[20] A lack of evidence will not satisfy this burden, and "conjecture is not enough."[21]

The purpose of the State's initiation of proceedings to terminate the parent-child relationship is "to protect the best interests of the children, not to punish parents for their conduct."[22] "[I]n securing what is in the best interests of the child,

---

[18]   *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

[19]   *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[20]   TEX. FAM. CODE § 101.007; *see In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). The clear-and-convincing-evidence standard applied in parental-termination cases is grounded in constitutional due-process concerns. *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403; *J.F.C.*, 96 S.W.3d at 263.

[21]   *In re E.N.C.*, 384 S.W.3d 796, 808–10 (Tex. 2012). Because the interest of the children is always of "paramount importance," a judgment by default is not available when the State seeks to involuntarily terminate a parent's rights. *Williams v. Williams*, 150 S.W.3d 436, 446–47 (Tex. App.—Austin 2004, pet. denied). A parent's failure to answer is not "taken as an admission of the allegations." *Id.*

[22]   *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003); *see also In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

the State is not pursuing a retributive or punitive aim, but a 'purely remedial function: the protection of minors.'"[23]

The father asserts that the evidence was legally and factually insufficient to support the trial court's decree terminating his parental rights. "When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence."[24]

In a legal-sufficiency review of a decree terminating parental rights, we consider "the evidence in the light most favorable to the judgment," meaning that we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."[25] We "disregard all evidence that a

---

[23]   *A.V.*, 113 S.W.3d at 361 (quoting *Ex parte Cantu*, 913 S.W.2d 701, 706 (Tex. App.—San Antonio 1995, writ ref'd)). "In addition, this aim is reflected in the State's duty to protect the safety and welfare of its children, a policy underlying the State's role in intervening, when necessary, in the parent-child relationship: 'The public policy of this state is to: . . . provide a safe, stable, and nonviolent environment for the child . . . .'" *Id.* (quoting TEX. FAM. CODE § 153.001(a)(2)).

[24]   *C.T.E.*, 95 S.W.3d at 465 (citing *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (per curiam)).

[25]   *J.F.C.*, 96 S.W.3d at 266. Although the Supreme Court of Texas expressly acknowledged the open question, the father has not argued that a de novo review is required by the U.S. Constitution. *See id.* at 268 (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685–86, 109 S. Ct. 2678, 2694–95 (1989), and *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 515–16, 104 S. Ct. 1949, 1968 (1984)); *see also ABA Standards*, *supra* note 8, at 31 (on appeal, a parent's attorney's brief "should

reasonable factfinder could have disbelieved or found to have been incredible."[26] If "no reasonable factfinder could form a firm belief or conviction" that the matter on which the State bears the burden of proof is true, then we "must conclude that the evidence is legally insufficient."[27]

The scope of our sufficiency review includes evidence admitted at trial, as well as any matter the trial court properly could have judicially noticed.[28] We may presume that the trial court took judicial notice of its record without any request being made and without announcement that it has done so.[29] This judicial notice encompasses the facts that "documents in the file are a part of the court's files, that they were filed with the court on a certain date, and that they were before the court

---

include novel legal arguments if there is a chance of developing favorable law in support of the parent's claim").

[26] *J.F.C.*, 96 S.W.3d at 266.

[27] *Id.* We do not measure clear-and-convincing evidence by counting the number of witnesses, admitted exhibits, or pages in the reporter's record. It is not the literal weight of the evidence that concerns us, but the probative force of the evidence that was before the factfinder. *See In re V.V.*, 349 S.W.3d 548, 552–55 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc).

[28] *See, e.g.*, *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.).

[29] *See In re K.F.*, 402 S.W.3d 497, 505 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *In re K.N.D.*, No. 01-12-00584-CV, 2014 WL 3970642, at *7 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op.).

at the time of the hearing."[30] However, the "trial court may not take judicial notice of the *truth* of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file."[31] In addition, a judge may not take judicial notice of a fact that he has learned over the course of litigation.[32] "Personal knowledge is not judicial knowledge."[33]

## I.    Best interest of the child

The father contends that the Department failed to prove by clear-and-convincing evidence that termination of his parental rights is in the children's best interest. He argues the evidence that the children were placed in separate foster homes and that the caseworker had never spoken with him demonstrated that "the Department failed to place family reunification as the main goal."

---

[30]   *In re C.S.*, 208 S.W.3d 77, 81 (Tex. App.—Fort Worth 2006, pet. denied); *accord Perez v. Williams*, 474 S.W.3d 408, 419 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

[31]   *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

[32]   *See id.* (discussing improper judicial notice of prior testimony in retrial of same case).

[33]   *Id.* at 693–94 (quoting *Wilson v. State*, 677 S.W.2d 518, 524 (Tex. Crim. App. 1984)).

The Department argues that evidence was sufficient to prove the best-interest element. Based on the father's 15-year sentence for aggravated assault with a deadly weapon, it argued that his conviction when all three children were aged three or younger, combined with his lengthy incarceration, meant he would be unable to provide for them during the "vast majority of their childhoods." Also, the father's incarceration left the children without the benefit of his care when their mother endangered them, leading to their removal and placement in foster care.

The Department further contends that the evidence shows that the father "made no effort" during the time his children were in its care "to contact or communicate with the children in any way." It contends that based on the absence of evidence of the father's effort to contact the children, the court reasonably could conclude that the father "had no relationship or bond with them." Relying on the return of service and the caseworker's testimony, the Department asserts that the father was served with notice of the suit, provided a family service plan, and mailed a letter notifying him of the case. Because the father participated in DNA testing as required by the plan, the Department argues the trial court reasonably could have concluded that the father received and understood the plan. Because the caseworker testified that the father had not "reached out" to her and, to her knowledge, had not sent any letters or cards to his children, the Department also argues there was no evidence that the father "participated in any meaningful

services offered him," or that he "demonstrated any ability to care for the children or meet their needs."

Finally, the Department argues that the finding that termination of the father's parental rights was in the best interest of the children was supported by evidence that showed their needs were being met in their current, separate placements, and that L.A.A.-M.'s placement was addressing his hearing loss "much better than any other placement." The Department asserts that this supported a conclusion that it had made plans for the children which were meeting their needs.

In determining whether the evidence in this case would permit a reasonable factfinder to form a firm belief or conviction that termination of the father's parental rights was in the children's best interest, we consider the nonexclusive *Holley* factors. These include (1) the children's desires, (2) the current and future emotional and physical needs of the children, (3) the current and future physical danger to the children, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the children, (6) plans for the children by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for

acts or omissions of the parent.[34] The Department was not required to prove all of these factors, and the absence of evidence about some factors would not preclude the factfinder from reasonably forming a strong conviction that termination is in the children's best interest, particularly if the evidence was undisputed that the parental relationship endangered the safety of the child.[35] Some cases, however, will present complex facts in which "paltry evidence" relevant to each *Holley* factor would not suffice to uphold a factfinding that termination is required.[36]

The *Holley* factors provide structure for a child-focused best-interest analysis, and in the over 40 years since *Holley* was decided, there have been significant advances in the law and public policy governing child-protection cases. The last decade has seen special emphasis placed on promoting placement of removed children with relatives, known as "kinship placements," as a preferred alternative to placing children with unrelated caregivers. There also has been a new emphasis on keeping siblings together when possible. While these concerns always would have been relevant to an analysis using the *Holley* factors, recent legislation has given these considerations given additional definition and focus.

---

[34] *Holley*, 544 S.W.2d at 371–72.

[35] *See C.H.*, 89 S.W.3d at 27.

[36] *Id.*

25

Concern for the emotional and physical needs of children removed from their parents led to the passage in 2008 of the federal Fostering Connections to Success and Increasing Adoptions Act.[37] Two of the Fostering Connections Act's primary goals were to improve outcomes for children by promoting kinship placements and helping removed children maintain connections with their siblings.[38]

---

[37] Pub. L. No. 110-351, 122 Stat. 3949 (2008) (codified as amended in scattered sections of Title 42 of the United States Code).

[38] One of the bill's cosponsors noted a "growing base of research illustrating that children do better living with relative guardians than they do living in traditional foster care" and the fact that "siblings are too often split apart at the time of placement" creating a separation "[j]ust when a foster child most needs their brother or sister." 154 CONG. REC. H8313 (daily ed. Sept. 17, 2008) (statement of Rep. McDermott); *see also Executive Committee Meeting to Consider S. 3038, Improve Adoption Incentives and Relative Guardianship Support Act of 2008; S. 1070, Elder Justice Act of 2008; S. 1577, Patient Safety and Abuse Prevention Act of 2008 Before the S. Comm. on Fin.*, 110th Cong. 9 (2008) (statement of Sen. Chuck Grassley, Member, S. Comm. on Fin.) (referencing "analysis from the Center for Law and Social Policy" showing that "children in kinship foster care have been found to experience fewer placement changes than children placed with non-kin foster parents do"); Tiffany Conway & Rutledge Q. Hutson, *Submission in Response to Senator Gordon Smith's July 26, 2007 Call For Papers to Examine the Needs of Grandparent and Other Relative Caregivers*, CTR. FOR LAW AND SOCIAL POLICY 4–5 (Sept. 10, 2007), http://www.clasp.org/resources-and-publications/files/0376.pdf; Tiffany Conway & Rutledge Q. Hutson, *Is Kinship Care Good for Kids?*, CTR. FOR LAW & SOCIAL POLICY 1–2 (Mar. 2, 2007), https://www.clasp.org/resources-and-publications/files/0347.pdf.

Title I of the Fostering Connections Act encourages and supports kinship placements as the first option for removed children. The Act provides federal funds to be used by the states to support kinship placements.[39] Use of these funds is conditioned upon states adopting the Fostering Connections requirements, including its kinship- and sibling-placement requirements.[40] The Act requires participating states to exercise due diligence to identify and notify within 30 days of removal all adult relatives of the child, including any identified by the child's parents, of their right to participate in the care and placement of the child.[41] With respect to sibling placement, the Act requires participating states to make reasonable efforts to place siblings together unless the state documents that it was not in the best interest of one or more of the siblings.[42]

Texas subsequently enacted a statute directing the Department to establish a Permanency Care Assistance (PCA) program as contemplated by the Fostering Connections Act to support kinship placement, and to adopt rules to "ensure that

---

[39]    *See* 42 U.S.C. § 670.

[40]    *See id.* § 671.

[41]    *See id.* § 671(a)(29).

[42]    *See id.* § 627(a)(31); *see also* 40 TEX. ADMIN. CODE § 700.1309(3) ("Siblings removed from their home should be placed together unless such placement would be contrary to the safety or well-being of any of the siblings[.]").

the program conforms to the requirements for federal assistance as required by" the

Act so that Texas could receive and use federal funds available to support the PCA

program.[43] The Legislature amended the Family Code to require identification and

notification of relatives about placement eligibility within 30 days of removal.[44]

The Department then adopted rules governing the PCA program consistent with

the requirements of the Fostering Connections Act,[45] and it updated the Child

Protective Services Handbook to include the notification requirements related to

identification and notification of relatives about placement eligibility within 30

days of removal, and the sibling-placement requirements.[46]

---

[43]   *See* TEX. FAM. CODE §§ 264.852–.853.

[44]   *See* Act of May 25, 2011, 82nd Leg. R.S., ch. 1070, § 2, 2011 Tex. Gen. Laws 2756, 2759 (consistent with section 103 of the Fostering Connections Act) (current version at TEX. FAM. CODE § 262.1095).

[45]   *See* 40 TEX. ADMIN. CODE § 700.1025–.1057.

[46]   *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., DFPS RESPONSE TO THE FOSTERING CONNECTIONS FEDERAL LEGISLATION: PROGRESS AS OF 10/1/13, (2013), https://www.dfps.state.tx.us/Child_Protection/Fostering_Connection s/DFPS_response.asp (noting updates were made to then-sections 2540, 4121, and 6123 of the CPS Handbook to require staff to notify relatives about placement eligibility within 30 days of removal and to attempt to place siblings together unless CPS documented that placement was not in children's best interest); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., CHILD PROTECTIVE SERVICES HANDBOOK § 3221 (2015) (requiring caseworker to provide parents the Child Caregiver Resource form to identify possible placements for children "as soon as possible" after removal); *id.* § 3224 (2015) (requiring notification of relatives within 30 days); *id.* § 4121 (2009) (requiring placement of siblings together "whenever possible"

## II.	Evaluation of *Holley* factors

Our strict scrutiny of this appeal requires us to consider the evidentiary record in light of the *Holley* factors, to evaluate whether the State carried its burden to prove, by clear-and-convincing evidence, the best interest of the children was served by terminating their father's parental rights.

### A.	*Holley* factor (1): The desires of the children

At the time of trial, the children's ages ranged from four to seven, and they had been in the temporary managing conservatorship of the Department for more than a year. No evidence was introduced about any desires expressed by the children. The Department argues that the record established that the father "had no contact with the children," and therefore the trial court could conclude "that he had no relationship or bond with them."

The father has been incarcerated for much of his children's lives, including the entire time since J.X.A.'s birth, which could suggest that the children may not be bonded to him. But there was no evidence about the children's connection with him or lack thereof. There also was no evidence that the children bonded to any

---

"unless it is in the best interest of one or more of the children to be placed separately"); *id.* §§ 4120, 4121 (2006 & 2009) (requiring caseworkers to consider placement with siblings when evaluating possible placements); *id.* § 4521 (2015) (requiring caseworkers to "make every effort to . . . place the child with his or her siblings, if possible," and to "continue to search" for a "qualified kinship caregiver" until one is found).

surrogate parent with whom they might be presumed to desire to establish a "forever home."[47] And although it was referenced in permanency reports to the court,[48] there was no evidence at trial about the children's bonds with each other, which could be relevant to their desires in light of the Department putting them in separate foster placements.

The Department relies on *In re A.H.L.*[49] to argue that the father's lack of contact with the children would permit the trial court to conclude he had no relationship or bond with them, and that this is relevant to evaluating evidence of the children's desires. The evidence in *A.H.L.* was materially different and distinguishable, as the child in that case was "bonded to his foster parents," who had "cared for him and provided for his continuing special medical and

---

[47]    *Cf. V.V.*, 349 S.W.3d at 558 (in best-interest analysis, contrasting "undisputed" evidence that 1½-year-old child had not "bonded" with her incarcerated father with evidence that child "was 'very bonded' with her foster family" that had cared for her for approximately one year).

[48]    While we do not consider the factual allegations included in the progress reports as part of our sufficiency analysis because the trial court could not have taken judicial notice of the factual matters included in them in reaching its findings or issuing its decree, we can take note of their existence and the fact that the caseworker filed them. *See Perez*, 474 S.W.3d at 419. Five different permanency reports filed from November 2015 to November 2016 stated that J.X.A. "loves to follow his older sister, [B.D.A.]" and that he "appears to be really attached to his sister, often crying if he is not able to be by her in the home." CR 124, 152, 187, 234, 271.

[49]    No. 01-16-00784-CV, 2017 WL 1149222, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.).

developmental needs" and with whom the child had been "since he was discharged from the hospital as an infant."[50] In contrast, this case lacked evidence about bonding or continuity of care in a foster family,[51] nor was there evidence that the father had no bond with his children, particularly the two who were born before he was imprisoned.

The burden of proof at trial was on the Department, and while there was no evidence of communications between the father and the children, the evidence likewise did not show a lack of contact between the father and his children. The only evidence in this regard was the caseworker's testimony that she had no personal knowledge that the father sent "any letters, any cards" to the children. The caseworker's testimony did not establish the extent of her personal familiarity with the children. The factfinder could not infer from the caseworker's lack of personal knowledge about any letters or cards from the father that there were none. Moreover, the caseworker's testimony did not address whether the father

---

[50]    *Id.* at *5.

[51]    *See generally* JOSEPH GOLDSTEIN ET AL., THE BEST INTERESTS OF THE CHILD: THE LEAST DETRIMENTAL ALTERNATIVE 9 (1996) (observing that what matters to children is "the pattern of day-to-day interchanges with the adults who take care of them and who, on the strength of such interactions, become the parent figures to whom they are attached").

communicated with the children by means other than letters or cards.[52] Combined with the lack of evidence that the children had bonded to their foster parents with whom they had been placed for an unspecified period of time, the evidence viewed in the light most favorable to the judgment did not support any inferences about the children's desires.

## B.   *Holley* factor (2): The emotional and physical needs of the children now and in the future

The evidence of the children's current and future emotional and physical needs was sparse. The caseworker was asked if the children were "doing well in each of their placements." She testified: "Yes. All of their needs are being met in each individual placement."

As evidenced by reports filed with the trial court and included in the appellate record, the caseworker had worked on this case for more than a year by the time of the termination trial in December 2016. She had filed progress reports prior to status hearings that addressed the medical, social, educational, and mental-health status of each of the children.[53] The caseworker did testify that L.A.A.-M.

---

[52]   *Cf.* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., CHILD PROTECTIVE SERVICES HANDBOOK § 6418.5 (2012) (noting "telephone, video conferencing, photo sharing" as other methods of contact between a child and an incarcerated parent).

[53]   While we do not consider the factual allegations included in the progress reports as part of our sufficiency analysis because the trial could not have taken judicial notice of the factual matters included in them in reaching its

had "moderate hearing loss in one ear, severe hearing loss in the other ear. He's not completely deaf, but there is severe hearing damage." This was evidence of one child's specific physical need, and the caseworker agreed with the Department's lawyer's suggestion that "his current placement is able to, in fact, much better than any other placement, address those needs." She did not testify about any particular emotional or physical needs of the other two children.

The Child Advocates representative's testimony similarly lacked any detail about the children's emotional and physical well-being at the time of trial. With respect to L.A.A.-M., the witness testified that a volunteer had communicated "on a regular basis with the public school there, the school for the deaf, the caregiver, and the educator on his special school placement . . . making sure that they are all in touch with one another." There was no evidence about the duration of the current placement or its successes or challenges, other than to assert it could "meet all of his needs." Nothing specific was said about the other two children. The volunteer had "seen" them, but no evidence was provided about their particular

---

findings or issuing its decree, we can take note of their existence and the fact that the caseworker filed them. *See Perez*, 474 S.W.3d at 419. The Department's permanency reports identified many other emotional and physical needs of the children that were not specifically addressed at trial. *E.g.*, CR 273–75 (mental health assessments, diagnoses, and recommendations for each child).

physical or emotional needs, other than a characterization of them as "basic level children that deserve to find permanency."

No other evidence was elicited at trial about the specific emotional or physical needs of the children, whether they enjoyed a special bond with each other, or other information that was included in the progress reports filed with the court. The reports are part of the clerk's record, and their contents presumably were known to the judge and all participants in the trial, but because they were not admitted into evidence the court as factfinder was not free to consider those facts in making its determination.[54] Similarly, despite what knowledge the trial participants may have shared, the witnesses did not testify about whether L.A.A.-M. was still diagnosed as autistic (as mentioned in the family service plan), the severity of that condition, the scope of his special needs in that regard, or, importantly, the degree to which that impacted the Department's ability to place him with his siblings. There was no evidence about the emotional effect of separating the three children, and no evidence that any of the foster parents had expressed any desire to adopt any of them.

Thus, there was evidence that in L.A.A.-M.'s current placement hearing loss was being addressed "much better than any other placement," and more generally, "all" of the children's needs were being met in each individual placement. But

---

[54] *See Guyton*, 332 S.W.3d at 693.

considered in light of the Department's clear-and-convincing evidentiary burden, the evidence relating to this factor was paltry.[55]

**C.     *Holley* factor (3): The emotional and physical danger to the children now and in the future**

The Department argues that the father endangered his children by committing "a serious and dangerous felony" when they were young, vulnerable, and in need of care. The children were thus subjected to the risk of being left without the care of a father, which especially endangered them when their mother could not care for them and now that she has relinquished her parental rights.

Children who are not looked after by either of their parents "undeniably" are "in serious danger of physical and emotional injury."[56] Imprisonment is a factor to

---

[55]     Similarly, in *Horvatich v. Texas Department of Protective & Regulatory Services*, 78 S.W.3d 594 (Tex. App.—Austin 2002, no pet.), there was no testimony about "the current well-being of the children." 78 S.W.3d at 601. The record contained "no testimony regarding how the children were doing in foster care, whether the children were being considered for adoption or the likelihood of their being adopted, or any testimony from anyone who had personal knowledge of the children at the time of trial." *Id.* at 602. The court of appeals held that the undeveloped state of the evidence was "so weak" as to be insufficient to prove by clear-and-convincing evidence that termination of the mother's parental rights was in the best interest of her three children. *Id.* at 604.

[56]     *V.V.*, 349 S.W.3d at 554.

be considered by the trial court on the issue of endangerment,[57] and it also factors into evaluating the best interest of a child.[58]

At trial, the Department introduced the judgment of the father's conviction for aggravated assault with a deadly weapon. There was no evidence that any child was endangered directly by the father's criminal conduct, nor was there evidence that the father had engaged in any pattern of repeated criminal activity.[59] The judgment of conviction did not include any enhancement allegations.

The evidence showed that the father was serving a 15-year prison term for aggravated robbery with a deadly weapon and would not be eligible for release until 2027 at the earliest. The father could not care for his children directly until his release. An incarcerated parent may provide support or care for his children through another person, such as a relative or friend "who has agreed to assume the incarcerated parent's obligation to care" for the children,[60] but the record lacks any

---

[57] *Boyd*, 727 S.W.2d at 533. A parent's intentional or repeated criminal activity can endanger a child. *See V.V.*, 349 S.W.3d at 555. The evidence must show a course of conduct on the part of the parent to demonstrate that the parent has endangered the children. *Boyd*, 727 S.W.2d at 534.

[58] *C.H.*, 89 S.W.3d at 28.

[59] *Cf. id.* (father "had an 'extensive criminal history involving drugs and assaults' which continued unabated" after child's birth).

[60] *See In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006).

information about the availability, or unavailability, of a surrogate who could care for the children on the father's behalf.

Additionally, the caseworker testified that the father did not correspond with his children by cards or letters, and he did not "reach out" to her. To the extent that failure to communicate with the children or the Department could have suggested a lack of fatherly concern about the children, which can be considered endangering behavior,[61] the record before us shows only that the father did not reach out to caseworker Sharkey. There was no evidence that if the father reached out to the Department, he would have done that through her. Indeed, the evidence suggests to the contrary. The family service plan listed another person, Deitra E. Smith, as the person for him to contact for information about the plan or his children, and it provided her phone number. Sharkey did not testify that the father never contacted the Department, only that the father never reached out to her. There was no evidence that Sharkey made any effort to determine whether the father contacted Smith or any other representative of the Department.

---

[61]     *Cf. In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (explaining that lack of concern demonstrated by appellant's failure to maintain contact with child or to contact the Department during incarceration was endangering behavior).

**D.** *Holley* **factors (4) & (6): Parental abilities and plans for the children by individuals or agency seeking custody**

The *Holley* factors include consideration of the parental abilities of the "individuals seeking custody," as well as the plans for the children "by these individuals or by the agency seeking custody."[62] The Department argues there was no evidence that the father "demonstrated any ability to care for the children or meet their needs," and he failed to present any evidence that he had a plan for the children's care. The father's incarceration significantly constrains his parental abilities.

The lack of evidence about the father's plans is a significant concern, but it remained the Department's burden to present clear-and-convincing evidence that his parental rights should be terminated. At least as troubling as the father's failure to present evidence of his plans, for our purposes, is the Department's "failure to present evidence concerning the children while in foster care as well as *its* future plans" for them.[63] Although the Supreme Court of Texas has held that "the lack of evidence about definitive plans for permanent placement and adoption cannot be

---

[62]   *Holley*, 544 S.W.2d at 372.

[63]   *Horvatich*, 78 S.W.3d at 601.

the dispositive factor," it nevertheless has acknowledged that evidence about placement plans and adoption is "relevant to best interest."[64]

The Department sought to assume permanent custody of the three children, yet there was no evidence at trial about the placement histories of the children, or that the Department is generally successful in its role as a surrogate parent.[65] There also was no evidence introduced at trial about the people who were caring for the children at the time of trial. The appellate record does not include any information about the parental abilities of the children's caregivers or the nature of the environments they provided for the children. The record also did not show that the current placements were seeking continued custody of the children.

As to the children's future, the Department presented no clear evidence of its plans. The caseworker did testify to a belief that "the children's best interest would be to stay in the placements that they are in and eventually become adoptive into a permanent placement where they will be stable and their needs can be met," suggesting that the Department planned for the children to remain in their current

---

[64] *C.H.*, 89 S.W.3d at 28.

[65] *Cf. M.D. v. Abbott*, 152 F. Supp. 3d 684, 813 (S.D. Tex. 2015) (concluding that the inadequacy of Department's number, geographic distribution, and array of placements for children in a licensed or verified foster care setting "places children far from their home communities, separated from their siblings, and in inappropriate placements," thus subjecting those children to an unreasonable risk of harm).

foster homes pending some future "permanent placement." Similarly, the Child

Advocates representative expressed views that L.A.A.-M.'s placement would

"hopefully become adoptive" and that B.D.A. and J.X.A. "are basic level children

that deserve to find permanency."[66]

The lack of evidence of a plan to achieve permanency does not imply that

the children would be destined to lengthy foster placements. But as children age, it

becomes more difficult to place them and to keep siblings together.[67] It was the

Department's burden to prove by clear-and-convincing evidence that termination

of the father's rights was in the children's best interests, but it "offered no evidence

regarding its plan for placement of the children," suggesting "it is as likely as not

---

[66]    *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no
pet.). In *A.H.*, the "only evidence of best interest was offered by the
caseworker who testified [that] termination of all parental rights was in the
children's best interest 'because the children need a loving family that will
care for them and take care of their needs.'" *Id.* at 807. Unlike this case, the
caregivers of the children in *A.H.* had expressed an interest in adopting them.
*Id.* The court of appeals held that the undisputed testimony was insufficient
to show that termination of the parent's rights was in the best interest of the
children because it was conclusory and did not "amount to more than a
scintilla of evidence." *Id.* Thus, the court concluded that the evidence was
legally insufficient to meet the clear-and-convincing evidence burden of
proof demanded by due process and the Family Code. *Id.*

[67]    *Horvatich*, 78 S.W.3d at 602.

that the children will remain in long-term foster care or even be separated" if their father's rights are terminated.[68]

In sum, the evidentiary record contains essentially no positive information about the parental abilities of any person seeking custody. The father's current incarceration is a negative indication about his parental abilities now and for the period of time relevant to these children, and the record is silent about the availability of a surrogate to provide care on behalf of the father during his incarceration. The evidentiary record is silent about the parental abilities of the Department in general, and of the current foster parents more specifically (other than the caseworker's general and conclusory opinion that "all" of the children's "needs are being met"), though there is no evidence that the current foster parents themselves are seeking custody. The lack of evidence about a plan for the children raises serious doubts that their circumstances will improve by terminating the rights of the father, although termination would be a necessary precondition to achieving permanency by way of adoption by non-relatives.

---

[68]    *Id.* (also noting that this factor "weighs strongly against a finding that termination is in the children's best interest"); *see also M.D.*, 152 F. Supp. 3d at 828 (observing that Texas foster children in the permanent managing conservatorship of the Department "almost uniformly leave State custody more damaged than when they entered").

**E.** ***Holley* factor (5): Availability of programs to assist the person seeking custody in promoting the best interests of the children**

The Department contends that the father failed to participate in "any meaningful services offered him," but the evidence suggests an absence of services offered to the father. In the "Tasks and Services" section of the family service plan, the father was assigned only one task: to "submit to DNA testing," which he did.[69]

The plan did not contemplate that the Department would administer its typical services to the father,[70] apparently due to his incarceration. Indeed, the plan

---

[69]    The "Service Plan Goals (Changes Needed to Reduce Risk)" included in the family service plan described the Department's objectives, and they did not assign specific tasks to the father.

[70]    By contrast to the father's plan, the mother also had a plan of service which was approved by and made an order of the trial court. CR 113. The mother's plan included many "Tasks and Services" that provided her the opportunity to demonstrate her ability and desire to maintain her relationship with the children. CR 100–08. The mother was required to "attend all court hearings, permanency conference meetings and family visits." The father's plan did not contemplate his participation in court hearings or permanency conferences. The mother was required to "maintain contact with her children during one hour visits, two times a month at the CPS office," which would be "scheduled when the parent makes contact with the agency to set up her visits." The father's plan did not require, or propose to schedule or facilitate, any visits between the father and the children. The mother was required to "participate fully in a Psycho-Social Evaluation to address her emotional needs," paid for by the agency. She also was required to "follow all recommendations from the evaluation that may include a Psychological Evaluation, Psychiatric Evaluation, individual therapy, family therapy, and/or group therapy." The mother was required to "participate in parenting classes in person that are at least 8 weeks long," and then demonstrate "learned behaviors during family visits with the child/children and through discussions with the caseworker." The father's plan did not include any of

stated: "Services will be requested if there is a sooner release date." Significantly, there was no evidence about services that are designed specifically for incarcerated parents and their children,[71] or that any such services were offered to the father and his children.[72]

Although there was no evidence presented about it at trial, we take judicial notice that the Legislature has required the Department to provide other programs that promote the best interest of the children by attempting to place them with relatives, when appropriate.[73] When a child is removed from her home and taken

---

these services. *Cf.* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., CHILD PROTECTIVE SERVICES HANDBOOK § 6418.4 (2012) ("Engaging an Incarcerated Parent"); *id.* § 6418.5 (2012) ("Service Planning for the Incarcerated Parent").

[71] *See, e.g.*, *C.T.E.*, 95 S.W.3d at 468 (incarcerated parent completed two parenting courses, a drug program, anger management classes, and job training classes). For example, one program that may be available to children of incarcerated parents is the Texas Department of Criminal Justice's GO KIDS program (Giving Offenders' Kids Incentive and Direction to Succeed). "The goal of the GO KIDS initiative is to help the kids of those persons under criminal justice supervision by identifying and coordinating resources that may assist them." http://www.tdcj.state.tx.us/gokids/index.html (last accessed July 21, 2017).

[72] *See In re J.K.V.*, 490 S.W.3d 250, 258 (Tex. App.—Texarkana 2016, no pet.) (evidence that no services were offered to parent weighed against termination).

[73] Several opinions in termination appeals have referenced relative (or fictive kin) placements who were taking advantage of "Fostering Connections" programs in Texas. *See, e.g.*, *In re J.M.I.*, No. 01-16-00829-CV, 2017 WL 1175568, at *4 (Tex. App.—Houston [1st Dist.] Mar. 30, 2017, no pet.)

into the State's care, the Department has an affirmative duty to identify the child's adult relatives, and to inform them about the case and how they can provide support or care for the child.[74] In particular, the Family Code imposes a nondiscretionary duty on the Department to "use due diligence to identify and locate" the child's relatives within the third degree of consanguinity and to seek information from each parent and relative of the child.[75] To facilitate the search for potential kinship placements, the Family Code requires that as "soon as possible after initiating an investigation of a parent," the Department must give the parent information relating to the investigation procedure, including a child placement resources form to identify potential "relative caregivers or designated caregivers."[76] Once relatives are identified, a variety of programs are available in

(mem. op.) (mother of terminated parent's girlfriend had not formally sought to adopt child, but she "testified that she had begun making preparations to do so by starting Fostering Connections and having the requisite background checks and inspections done"); *In re A.A.*, No. 01-13-00542-CV, 2013 WL 6569922, at *5 (Tex. App.—Houston [1st Dist.] Dec. 12, 2013, pet. denied) (mem. op.) (children placed with aunt who had "become a licensed foster parent" and received "money from Fostering Connections to pay for the children's needs").

[74]   *See* TEX. FAM. CODE § 262.1095.

[75]   *Id.* § 262.1095(a)(1), (d).

[76]   *Id.* § 261.307(a)(2). To accomplish this notification, the Department has created the "Child Caregiver Resource Form," Form 2625, which asks a parent to provide "names and locating information for relatives or close family friends who may want to take care of your children," and it

Texas to provide financial and psychosocial support to adults who become caregivers to their minor relatives in the foster care system.[77]

The clerk's record reflects that on July 9, 2015, the trial court entered a temporary order following an adversary hearing. The order noted that the mother appeared in person and through her attorney of record, but the father was not notified and did not appear. The trial court found that the mother had submitted the child placement resources form but the father had not. It ordered "each parent" to submit the form if it had not been provided previously. Finally, it ordered the Department to "continue to evaluate substitute caregiver options" until it identified "a relative or other designated individual qualified to be a substitute caregiver."

---

encourages the parent to "list the people you know your child would feel happiest with." https://www.dfps.state.tx.us/Search/default.asp?q=child+caregiver+resources+form. An attachment to the form requests contact information for "grandparents, great grandparents and adult aunts, uncles, siblings, nieces, and nephews . . . [and] any other relatives [or] close family friends who may be able to help while your child is in care." *Id.* The obligation to investigate and identify adult relatives of children removed from their homes by the Department is mandatory, without regard to whether the parent has completed "the proposed child placement resources form." TEX. FAM. CODE § 262.1095(e). The Department is then required to "perform a background and criminal history check of the relatives or other designated individuals identified as a potential relative or designated caregiver . . . on the proposed child placement resources form." *Id.* § 262.114.

[77] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Kinship Manual*, http://www.dfps.state.tx.us/Adoption_and_Foster_Care/Kinship_Care/documents/KinshipManual.pdf.

Every subsequent status hearing order noted that the father appeared only through his attorney of record and that he had not completed the child placement resources form, filed it with the court, or submitted it to the Department.[78]

The Department presented no evidence at trial about its efforts, if any, to satisfy its duty under the Family Code to investigate potential kinship placements for the benefit of the children. The only evidence in the record about what was sent to the father is the return of service from when he was served with the petition, and the caseworker's trial testimony. She was asked if she had "reached out" to the father, and she replied only that he "was mailed a family plan of service as well as a letter to notify him of the case." The caseworker's letter was not offered into evidence, and there was no proof that the father received it. She testified that she never spoke to him.

Although there are programs available to facilitate and assist placement of the children with their relatives, the Department presented no evidence that they were utilized, and no evidence to explain why not. The family service plan entered into evidence made reference to "a cousin" who had kept the children previously and an initial "relative placement" for B.D.A. and J.X.A.; the Department provided no evidence about whether services were offered to those relatives or why these or

---

[78] Although the father's appointed attorney ad litem had a duty to provide the form to his client, *see supra* note 8, the Department had an independent duty to provide the father a copy of the form, *see* TEX. FAM. CODE § 261.307, and the record contains no evidence that it did.

other relative placements are not available to the children now. In her testimony, the caseworker referenced the father's "sister," yet the record includes no evidence about whether that aunt of the children was considered as a possible kinship placement, and whether services were offered to her.[79]

Finally, as previously noted, the Department sought permanent custody of the children and there was no evidence that any of the current foster placements are seeking custody. The Department presented no evidence of programs that would be available to it or to assist the foster parents or future adoptive parents.

**F.      *Holley* factor (7): The stability of the home or proposed placement**

The Department argued that evidence concerning stability of the home weighs in favor of termination because of the father's incarceration and his failure to make an effort to provide the children with a safe and stable environment. The father's prison sentence prevents him from personally caring for the children. The Department also contends that the evidence that the children are doing well in their

---

[79]   While we do not consider the factual allegations included in the clerk's record as part of our sufficiency analysis because the trial could not have taken judicial notice of the factual matters included in them in reaching its findings or issuing its decree, we can take note of their existence. *See Perez*, 474 S.W.3d at 419. A careful reading of the clerk's record would have provided all participants in the proceedings with clues about other possible relative placements, but the trial record has no evidence about whether they were considered and whether services were offered to them.

respective placements demonstrates that it "had made plans for the children which were meeting their needs."

The father's incarceration is not the only factor destabilizing the home lives of these children. The evidence presented at trial did not address the duration of the then-current placements of the children, which the caseworker concluded were meeting "all" of the children's needs. The Child Advocates representative expressed no opinion about the stability of the separate homes where B.D.A. and J.X.A. had been placed; she said only that they "deserve to find permanency." She also said that the placement for L.A.A.-M. "hopefully will become adoptive."

Simply put, the Department presented evidence that the children's immediate needs were being met in their separate foster placements, but it did not present evidence of stability, either in the current placements or in any proposed permanent placement.[80] No party offered evidence about any stability proposed to be achieved by the termination of the father's parental rights.[81]

---

[80]    We do not consider the factual allegations in the reports filed in the clerk's record for the truth of the statements because those are not matters that properly could be the subject of judicial notice. However, prior to each permanency hearing the Department filed a report which, among other things, identified the current placement for each child. At or after the status hearings, the trial court entered an order that, among other things, approved the children's "current placement." Based on these filings, we can observe the procedural fact that the Department's final permanency report filed before trial on November 23, 2016 showed five separate foster placements for each of B.D.A. and J.X.A. over the course of approximately 15 months (in addition to a 3-month period when they were returned to the mother's

48

**G.** ***Holley* factors (8) & (9): Acts or omissions of the parent that may indicate that the parent-child relationship is improper, and any excuse for such acts or omissions**

The father was serving a 15-year sentence for aggravated robbery, making him unavailable to care for his children. The caseworker testified that, to her knowledge, the father did not send his children cards or letters while the case was pending. As previously noted, this limited evidence did not prove the father did not communicate with his children, and this is not proof of an improper relationship.

The Department also relies on the fact that the father did not appear at any of the status hearings or at trial to present evidence on his own behalf. The father was incarcerated at the time of all of those hearings, and his participation would have required a bench warrant or court permission for him to participate by phone. The

---

home). If the children had not been moved again between the final report and trial on December 16, 2016 (there was no trial evidence that they weren't), the information in the report suggested that they had been in their current placements for one month, since November 16, 2016. L.A.A.-M. reportedly spent two months in an "Emergency Shelter" before being moved through a series of three different foster homes. The final permanency report stated that L.A.A.-M had been in his final reported placement for two days as of the date of the report. CR 272.

[81] *See C.T.E.*, 95 S.W.3d at 468 (holding that frequent moves in foster care and separation of siblings from each other was evidence of instability in lives of children while under Department conservatorship); *see also In re I.B.*, No. 13-17-00098-CV, 2017 WL 2806779, at *11 (Tex. App.—Corpus Christi June 29, 2017, no pet. h.) (mem. op.) (noting, as best-interest factors, that "children were separated from their siblings, had been moved frequently between foster placements and . . . there were no concrete plans for a more permanent placement").

father's failure to participate in the trial could be perceived as inconsistent with a proper parent-child relationship, but that did not diminish the Department's burden to prove its case at trial, and it made no evidentiary record to demonstrate the absence of good cause for the father's non-participation. As the father presented no evidence at trial, there was no indication of his excuses, if any, for failing to participate in the proceedings.

## III.    Application of *Holley* factors

In light of the foregoing analysis of evidence presented relating to the *Holley* factors, we must determine whether a reasonable factfinder could form a firm belief or conviction that termination of the father's parental rights was in the best interest of the children.[82] Our explanation of our conclusion is based on the particular deficiencies of the record in this case, and it should not be misconstrued as a holding that the Department is required, to satisfy its burden, to prove all the kinds of evidence discussed below in every case.

It bears repeating that termination of parental rights is not a civil punishment that may be meted out to any incarcerated parent. Depending on the circumstances, termination of parental rights ultimately may be a consequence of a crime, but the children in this case were entitled to due process, reasonable efforts to facilitate the

---

[82]    *J.F.C.*, 96 S.W.3d at 266.

preservation of the natural connection to their family, and a trial where the State was held to its burden of proof.

We acknowledge the inherent limits of our appellate review, and the possibility, even the likelihood, that there may be additional facts and circumstances in this case that, if proved at trial, could have justified the termination of parental rights. But the Department, the attorneys ad litem, and the trial court also must understand the same limitations of appellate review. When the termination of parental rights is justified to create an opportunity for a child to have a chance for a better life with a new forever family because it is in her best interest, to accomplish that result, the judges and officers of the court must respect due process by documenting a sufficient measure of evidence in a record that supports that outcome.

On the face of this appellate record, there is no meaningful evidence that the Department, the guardian ad litem, the trial court, or even the father's own attorneys ad litem ensured that services which might have been available actually were offered to the father. Such services were not only important for the father to protect his rights as a parent, they were important to protect the children's right to maintain bonds with their family. The services could have been provided but not documented. From the appellate record, we can't know.

More importantly, there is no meaningful evidence that other services and programs intended to help the plight of the three children involved in this case were utilized. The Department did not prove that it investigated potential kinship placements on both the mother's and father's sides of the family. This was important not only to protect the rights of the parents, but also to protect the rights of the children to an opportunity to maintain their natural family bonds to each other and to relatives who are more likely than unrelated foster parents to provide the permanency these children deserve.

Reviewing the evidence presented to the trial court, there was no basis upon which to conclude that the children, at this stage, desire termination of their father's parental rights.

Terminating the incarcerated father's parental rights was not shown to improve the outlook for the current and future emotional and physical needs of the children. At the time of trial, the current placements had the three siblings separated from one another. The Department did not show why this was necessary, and it presented no evidence that it planned to keep the siblings together to the extent possible. The Department did not show that even with available services, such as Fostering Connections, there was no kinship placement could serve the children's needs at least as well as any foster placement.

Terminating the incarcerated father's parental rights was not shown to reduce any current or future physical danger to the children.

The Department and its foster placements were not shown to have better parental abilities than any possible kinship placement.

There was not sufficient evidence at trial for a reasonable factfinder to form a firm belief that the Department exercised reasonable efforts to render appropriate services to the father, or to offer Fostering Connections or other services to potential kinship placements. There also was no evidence about services that were available to foster parents or unidentified future adoptive parents.

The Department presented no evidence about the likelihood that it could find permanent unrelated placements for any of the children. It presented no evidence about the children's placement history, by which the prospect of a future permanent placement might be evaluated. It presented no meaningful evidence that terminating the father's parental rights would increase the likelihood that the children would be placed in a stable home.

The father's criminal activity that has rendered him ineligible to serve as a day-to-day parent is an important consideration that has contributed significantly to his children's unfortunate circumstance. But there was no evidence of a pattern of criminal behavior, nor was there evidence that his criminal behavior directly endangered any child. There was no direct evidence from the father of any excuse

for not participating in services or offering a substantive defense at trial, but the Department, which bore the burden of proof, did not present any evidence to negate an appearance that the father's non-involvement could be attributable to a systemic failure to offer him a meaningful opportunity to defend his interest in preserving a connection to his children.

The Department's arguments rely heavily on the father's failure to produce evidence relating to various *Holley* factors, but a lack of evidence contradicting a finding does not constitute evidence supporting the finding.[83] The Department bore the burden of proof at trial by clear-and-convincing evidence, and the termination decree cannot be justified merely by blaming the father for his past failures. The objective of the proceeding was to achieve the best outcome for the children. In the absence of evidence that the Department adequately sought out kinship placements, so as to justify placing these children with unrelated foster parents instead, and in the absence of any evidence of an intention to keep the siblings together to the extent possible or a justification for the three separate placements at the time of trial, the evidence that termination is in the children's best interest at the time of trial was not clear and convincing.

---

[83]     *E.N.C.*, 384 S.W.3d at 808.

## Conclusion

Considering the evidence and the *Holley* factors, and despite the fact of the father's incarceration, we conclude that on the record before us, no rational factfinder could form a firm belief or conviction that termination of the appellant father's parental rights was in the best interest of B.D.A., L.A.A.-M., and J.X.A.[84] We reverse the judgment of the trial court, render partial judgment denying the Department's petition,[85] and remand this case to the trial court for further proceedings.

Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Massengale.

---

[84] *See J.F.C.*, 96 S.W.3d at 266. We would reach the same conclusion applying a factual-insufficiency standard of review, undertaking an exacting review of the entire record with a healthy regard for the constitutional interests at stake. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *C.H.*, 89 S.W.3d at 26. In light of this conclusion, we need not address the other issues raised in this appeal. *See* TEX. R. APP. P. 47.1.

[85] *See J.F.C.*, 96 S.W.3d at 266. ("Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence."); *see also In re C.M.C.*, 273 S.W.3d 862, 882 n.13 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (in a reversal of a termination decree, noting inability to render a judgment that disposes of all remaining issues).